IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GERALD L. TUCKER, | CASE NO. CV-F-04-5662 OWW DLB HC |
| Petitioner, | FINDINGS AND RECOMMENDATIONS REGARDING AMENDED PETITION |
| vs. | FOR WRIT OF HABEAS CORPUS |
| STUART RYAN, WARDEN, | [Doc. 13] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

PROCEDURAL BACKGROUND[1]

On May 8, 2002, Petitioner was convicted in the Tulare County Superior Court of murder during the perpetration or attempted perpetration of rape and residential burglary. (Cal. Pen. Code[2] §§ 187/189; CT 2356-2357.) Petitioner was sentenced to an indeterminate life term in prison. (Respondent's Exh. 1; CT 2410-2411.)

On October 4, 2002, Petitioner filed a petition for writ of habeas corpus with the Tulare County Superior Court. The petition was denied on October 11, 2002. (Respondent's Exh. 2.)

---

[1] This information is derived from the petition for writ of habeas corpus and Respondent's answer to the petition.

[2] All further statutory references are to the California Penal Code unless otherwise indicated.

1

1    On October 15, 2002, Petitioner filed a petition for writ of habeas corpus with the California
2 Court of Appeal for the Fifth Appellate District.  That court denied the petition on October 24, 2002.
3 (Respondent's Exh. 3.)
4    On or about February 14, 2003, Petitioner filed an opening brief in the direct appeal before
5 the Fifth District Court of Appeal.  (Respondent's Exh. 4.)
6    On April 24, 2003, Petitioner filed a petition for writ of habeas corpus with the Tulare
7 County Superior Court.  That court denied the petition on May 14, 2003.  (Respondent's Exh. 5.)
8    On May 5, 2003, Petitioner filed a second petition for writ of habeas corpus with the Fifth
9 District Court of Appeal.  The petition was denied on May 23, 2003.  (Respondent's Exh. 6.)
10   On June 10, 2003, Petitioner filed a third petition for writ of habeas corpus with the Fifth
11 District Court of Appeal.  The court denied the petition the same day.  (Respondent's Exh. 7.)
12   On June 27, 2003, Petitioner filed a fourth petition for writ of habeas corpus, and a request
13 for consolidation with the pending appeal, in the Fifth District Court of Appeal.  The petition and
14 request for consolidation was denied on July 10, 2003.  (Respondent's Exh. 8.)
15   On July 10, 2003, Petitioner filed a petition for writ of habeas corpus with the California
16 Supreme Court.  (Respondent's Exh. 9.)
17   On December 8, 2003, the Fifth District Court of Appeal affirmed the conviction.  The court
18 did, however, remand the matter "for the sole purpose of considering whether presentence conduct
19 credits should be awarded under the relevant law applicable on the date the crime was committed."
20 (Respondent's Exh. 10.)
21   On December 23, 2003, the California Supreme Court denied the habeas petition filed July
22 10, 2003.  (Respondent's Exh. 11.)
23   On or about January 8, 2004, Petitioner filed a petition for review with the California
24 Supreme Court.  The petition was denied on February 24, 2004.  (Respondent's Exh. 12.)
25   On September 15, 2004, Petitioner filed another petition for writ of habeas corpus with the
26 Tulare County Superior Court.  That court denied the petition on September 20, 2004.
27 (Respondent's Exh. 13.)
28   Petitioner filed the instant petition for writ of habeas corpus on May 3, 2004.  Petitioner filed

an amended petition on July 23, 2004. Pursuant to this Court's order of October 5, 2004, Respondent filed an answer to the amended petition on December 30, 2004, and Petitioner filed a traverse on March 21, 2005.

## STATEMENT OF FACTS[3]

In May 2002, [Petitioner] Gerald Tucker was convicted by a jury of the 1969 first degree murder of Wilma M. [Petitioner] was sentenced to life, with 809 days credit for time served.

On Friday, December 19, 1969, Wilma M. spent the evening with her brother Esmond and his wife Gloria. She stayed until approximately 12:30 a.m., Saturday morning, when she left to return home. Wilma's parents, Wilbert and Marion M., drove to their daughter's apartment at approximately 11:00 p.m. on the 20th, after Wilma failed to appear for a scheduled dinner at their home. After receiving no answer to his knocks, Wilbert climbed through a back window and discovered Wilma's nude body on the living room couch. The body was covered with a blanket and there were signs of trauma, although the body had been cleaned of blood. A pile of blood-spattered clothes was found on the bedroom floor.

Wilma had bruises on her wrists, ankle, thigh and face. Her facial injuries included a laceration, swelling and bruises, all of which were consistent with her having been struck in the face at least twice. There was foam-like material extruding from her mouth, later identified as evidence of severe pulmonary edema, a common symptom of an asphyxial death.[4] The external and internal injuries to Wilma's neck were consistent with mechanical asphyxiation, which could include manual strangulation or ligature strangulation. There were sperm heads in Wilma's vagina, proof that she had had recent sexual intercourse.[5] Semen was found matted in her pubic hair. Dr. Slaughter, a medical doctor who qualified as an expert in forensic sexual assault investigation, testified that there was trauma to the anus, finger "grab mark" bruising and nonmenstrual blood in the vaginal cavity. This last finding, according to Dr. Slaughter, was evidence of trauma to the uterus. Dr. Slaughter testified these observations were consistent with sexual assault.

Wilma's next-door neighbor in 1969, Sherrel Galbraith, testified she was awakened at approximately 2:30 or 2:45 on December 20 by loud noises coming from Wilma's apartment. She said the walls rumbled and it sounded like bowling balls were being dropped. She said she heard a male voice say, "shut up, bitch." At trial she identified [Petitioner] as the man she had seen twice before outside Wilma's apartment. She had not identified him earlier because she was afraid.

Steven Nylander, one of Wilma's neighbors, was having a Christmas party on

---

[3] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth Appellate District appearing as Exhibit 10, of the Answer to the Petition for Writ of Habeas Corpus. The Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

[4] Dr. Jude Hayes, who was deceased at the time of trial, performed the forensic autopsy. Dr. Welti, a forensic pathologist, reviewed Dr. Hayes's notes and the available photographs and testified that the cause of death was mechanical asphyxiation. The death certificate stated the cause of death was aspiration of gastric contents and pulmonary edema. Dr. Welti testified these are both "frequent accompaniments" of death by mechanical asphyxiation.

[5] Dr. Pearson, an obstetrician gynecologist testifying for the defense, stated that as a rough rule of thumb, sperm remains viable in the vagina for 76 hours.

the night of the killing.  Although police interviewed Nylander and his guests, none of them saw or heard anything that night as they left the party, which ended between 12:00 p.m. and 1:00 a.m.  Wayne and Elizabeth Ludvickson also lived in the apartment complex.  They had been visiting friends on the evening of December 19 and did not return home until early on December 20, at approximately 3:30 a.m.  When they pulled in the driveway, they saw a white or light colored Ford Thunderbird automobile in the parking lot.  As they drove in, the driver of the Thunderbird turned on his bright lights and ducked.  The automobile they saw did not belong to Oscar Atamian,[6] another resident of the apartment complex.  Elizabeth Ludvickson described the driver of the car as being dark complected, with a lean face and dark hair.

Testimony established that Wilma had a friendly relationship with [Petitioner], who she met through his aunt, Juanita Coleman, who worked at the Tulare County Welfare Department with Wilma.  Wilma was trying to help [Petitioner] and one night took him to her brother's house to talk about educational opportunities.  Another time [Petitioner] joined Wilma and her family at a football game.  Coleman was not aware of any dating relationship between the two.  Marion M. testified that Wilma did not have a romantic relationship with [Petitioner] and that Wilma had expressed fear of him.  Esmond and Gloria M. testified that Wilma confided to them that [Petitioner] had tried to kiss her and had made unwanted advances towards her and that she was frightened of him.  Shirley May Alcantar, a close friend and coworker of Wilma's, testified that Wilma knew [Petitioner] through Bible study and that he came to Wilma's apartment once or twice a week.  She said Wilma told her that [Petitioner] made her uncomfortable with his advances.[7]

Dr. Blake, a forensic serologist, testified as a DNA expert.  He testified that DNA was extracted from the semen found in the victim's pubic hair and was tested using the STR (short random repeat) PCR (polymerase chain reaction) methodology in 1998.  The test results established that the DNA extracted matched [Petitioner's] genetic profile and that there was a one in ten million trillion chance that a random individual selected off the streets would have the same genetic profile.  Steven Myers, a senior criminologist for the Department of Justice also evaluated the DNA extracted from the semen and testified there was a one in 37 trillion chance that a randomly selected individual would match the genetic profile of the semen's donor and that [Petitioner's] did match.  Myers said there was a difference between his numbers and Dr. Blake's numbers because Myers tested nine sites on the genome and Dr. Blake tested thirteen.  Both experts testified that, although DNA scientists do not state as fact that the DNA found was [Petitioner's], the results essentially individualized the DNA as [Petitioner's].  Both experts testified that meaningful DNA testing, allowing individualized results, was not available to law enforcement until the late 1990's, especially with a 20-year-old degraded sample.

Over [Petitioner's] objections, two witnesses testified concerning prior sexual assaults they had suffered at the hands of [Petitioner].  The first victim, P.L., testified that in 1979, [Petitioner] lived behind her in an apartment he shared with his mother.  They had a friendly relationship and [Petitioner] had been inside for coffee.  One night, after she had gone to bed, [Petitioner] entered her apartment and sexually assaulted her.  He became violent when P.L. resisted, hitting her in the face and choking her.  The second victim, M.G. testified [Petitioner] sexually assaulted her in

---

[6] Atamian was also deceased at the time of trial, as were both Wilma's parents and defense witness Red Edwards.  Marion M. testified at the preliminary hearing, and a videotape of her testimony was played at trial.

[7] Detective Luttrell testified Alcantar told him in 1969 that Wilma had mentioned a "petting session" with [Petitioner] on one of the visits to her apartment.  Alcantar testified that she told the truth when talking to police in 1969, but did not remember Wilma saying anything about a "petting session" and that this was not her terminology.

February 1969, when she was 14 years old. She testified she went with [Petitioner] and others out to the countryside in a car to hang out and drink. [Petitioner] became angry when denied sexual favors and began to choke M.G. by wrapping her hair around her neck. [Petitioner] hit her in the face during the attack. M.G. was able to escape when another car appeared and distracted [Petitioner]. Both women reported the offenses, but neither case went to trial.

*Defense*

[Petitioner] testified that he had met Wilma in June or July of 1969 and that they began a sexual relationship shortly thereafter. He claimed Wilma as his "woman." He testified that, although he never drove his car to Wilma's house, he went to her apartment two or three times a week. He said the last time he saw Wilma was the last week of November 1969 or the first week in December 1969, and that they had sex for the last time about one week before. He said he never told anyone about his relationship with Wilma, but they did go to her brother's house once to "test" how they would "take" the "racial issue." He denied hitting Wilma. He claims that, on the 19th of December, he went to his brother Freddy Ford's house around 5:00 p.m. At midnight, [Petitioner] left his brother's house with Terry Sullivan and Benny Bradley Crawford to go to the Crow's Nest, a bar in Visalia. According to [Petitioner], the three stayed there until closing, and then returned to Crawford's house.[8] He said he did not know how long he stayed at Crawford's house, but that he woke up around 7:00 or 8:00 a.m. at Terry Sullivan's apartment.[9] After waking, he drove back to his brother's house. Sullivan was not there when he left. He said he learned of Wilma's death on Sunday the 21st, when he spoke with Coleman. He said that on Saturday night he was with William Lockhart, also known as Billy Murphy, and Red Edwards at a pool hall in Fresno run by Dorothy Faye Tucker.

Ford testified that on the 19th, [Petitioner], Sullivan and Crawford were at his house. They arrived between 5:00 and 6:00 p.m. and left around 12:30 p.m.

*Rebuttal*

Luttrell testified that, when he was interviewed in May 1970, [Petitioner] said he had been drinking at the Crow's Nest with Sullivan and Crawford until around 3:00 a.m., when they left to go to Crawford's. He said he left there at 4 a.m. and drove to the pool hall run by Dorothy Faye Tucker. He claimed that there he ran into Lockhart and Edwards, and remained with them at the pool hall until he returned to his brother's house at 8:00 a.m.

(Respondent's Exhibit 10, at 2-6.)

## DISCUSSION

A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as

---

[8] Luttrell testified that it is a 16-minute drive from Crawford's house to Wilma's apartment.

[9] Nothing in the record explains why Sullivan did not testify at the trial or preliminary hearing. [Petitioner] does not claim, however, that Sullivan was unavailable.

5

guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The AEDPA altered the standard of review that a federal habeas court must apply with respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v. Taylor, 120 S.Ct. 1495, 1518-23 (2000). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct. 1495, 1523 (2000). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

While habeas corpus relief is an important instrument to assure that individuals are

constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983); Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal conviction is the primary method for a petitioner to challenge that conviction. Brecht v. Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993). In addition, the state court's factual determinations must be presumed correct, and the federal court must accept all factual findings made by the state court unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769 (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380, 1388 (9th Cir. 1997).

C.   Ineffective Assistance of Counsel

Petitioner contends that trial counsel provided ineffective assistance by failing to object to the introduction of evidence relating to the victim's good character.

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must

also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984).  Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062 (2000).

In rejecting Petitioner's claim on direct appeal, the Court of Appeal held:

> [Petitioner] was not deprived of effective assistance of counsel when his defense attorney failed to object to the introduction of evidence of Wilma's good character.
> Wilma's brother and sister-in-law testified that Wilma was a "chaste, religious young woman who would not engage in premarital sex" and that she lived by the "scout law." This is general character evidence relevant to the issue of whether there had been consensual intercourse between Wilma and [Petitioner].[10] [Citation Omitted.] Given the limited nature of the evidence, it is entirely possible, even if the evidence was objectionable, that there was a strong tactical reason for counsel to remain silent.  It is entirely possible that defense counsel chose not to risk angering the jury by challenging the revered memories of a family testifying about a lost beloved sister[.] [Citations Omitted.]
> Moreover, [Petitioner] has not shown the necessary prejudice.  Although the evidence was undoubtedly offered to establish that a consensual sexual relationship with [Petitioner] would have been out of character for Wilma, the absence of the challenged evidence would not likely have changed the result in this case, given the overwhelming evidence of sexual assault.  Even if there had been a consensual relationship at some point, the evidence strongly suggested the intercourse at the time of the murder was not consensual. [Petitioner's] claim that he had consensual sex with Wilma some weeks prior to the murder was unlikely to have been credited by the jury, certainly no more than his theory that the semen had been deposited by police as part of some unexplained conspiracy. [Citations Omitted.]

(Respondent's Exh. 10, at 19-20.)

---

[10] Esmond M. testified his sister has the character of a scout - - "friendly, trustworthy, loyal, helpful, cheerful, thrifty, brave, clean reverent" - - and that she had a strong faith in God.  He also testified she went to church regularly.  The admission of such evidence is governed by section 1103.  We do not decide whether this evidence was admissible.

8

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The state court of appeal properly held that there may have been a sound tactical reason for counsel's failure to object to the testimony. The Court of Appeal reasoned that given the limited nature of the evidence, trial counsel might have chosen not to challenge the revered memories of a family member testifying about a lost beloved sister, and thus anger the jury. (Respondent's Exh. 10, at 19-20.)

Further, the Court of Appeal properly held that Petitioner failed to demonstrate prejudice. This holding was not an unreasonable application of Strickland. As previously stated, Petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. Petitioner has not made this showing.

Even had counsel objected and succeeded in the objection, the prosecution's evidence was overwhelming greatly diminishing any showing of prejudice. As Respondent submits, eye witness testimony put Petitioner at the crime scene near the time of the murder (RT 548, 581, 588-589, 599) and DNA evidence established his semen was found on the victim's body (RT 828, 1581-1593, 1640, 1646-1650.) Physical evidence established the victim had injuries consistent with sexual assault, rather than consensual intercourse. (RT 1047, 1051, 1055-1061, 1098.) A mixed-source blood stain found on the victim's clothing was consistent with both the victim and Petitioner. (RT 1681-1684.) Further, sexual assault propensity evidence was admitted by way of two women, who testified Petitioner sexually attacked them. (RT 1388-1399, 1411-1414, 1496, 1499-1500, 1505-1507.) As the Court of Appeal stated, although the character evidence was undoubtedly admitted to establish that a consensual sexual relationship would have been out of character for Wilma, given the overwhelming independent evidence establishing Petitioner's guilt and the minimal significance of the character evidence, there is not a reasonable probability that the absence of the challenged evidence would have changed the outcome. Even had there been a consensual relationship at some point, the evidence admitted at trial strongly suggested that the intercourse at the time of the murder was not consensual. Again, the state courts' determination was not contrary to or, an unreasonable application of Strickland.

D.     Pre-Accusation Delay

Petitioner contends that the 29-year pre-complaint delay violated his due process right under the Fifth and Fourteenth Amendments of the United States Constitution. Petitioner claims he was prejudiced by the deaths of several witnesses, destruction or loss of physical evidence, and the fading memory of witnesses.

The Fifth Amendment due process clause protects against "oppressive" pre-indictment delay. United States v. Lovasco, 431 U.S. 783, 788 (1977). However, because of statutory safeguards in the form of the statute of limitations, "the Due Process Clause has a limited role to play in protecting against oppressive delay." Id. at 789. Courts must apply a two-part test to determine whether pre-indictment delay results in a denial of due process: (1) the defendant must prove actual, non-speculative prejudice from the delay; and (2) the length of the delay, when balanced against the reason for the delay, must offend those "fundamental conceptions of justice which lie at the base of our civil and political institutions." United States v. Sherlock, 962 F.2d 1349, 1353-54 (9th Cir. 1992) (citing Lovasco, 431 U.S. at 790.) It is not enough to assert that witnesses' memories have faded with the passage of time. Prantil v. California, 843 F.2d 314, 318 (9th Cir. 1988). Nor is it enough to assert that testimony was lost if the expected content of the testimony was generally speculative and cumulative. See United States v. Ross, 123 F.3d 1181, 1186 (9th Cir. 1997). Unless actual prejudice is demonstrated, the reasons for the delay need not be considered. Id.

In rejecting Petitioner's claim on direct appeal, the Court of Appeal concluded:

> [Petitioner's] federal due process claim must be rejected because there is no evidence to support a conclusion that the delay was undertaken to gain a tactical advantage over the defendant. (*See United States v. Lovasco*, 431 U.S. 783, 795 (1977) [a claim that due process was denied by a preaccusation delay, based upon the federal Constitution, requires a showing that the delay was undertaken to gain a tactical advantage over the defendant]; *United States v. Marion*, 404 U.S. 307 (1971) [preaccusation delay violates due process clause only where delay is intentionally caused by the state].) Although [Petitioner] was a suspect in this case in 1969, there was no physical evidence, and scant circumstantial evidence, linking him to the murder until 1998, when the advancement of science allowed for DNA testing of the semen residue. The record establishes that the prosecution gained nothing from the delay except for the scientific advancements in DNA testing.
> However, the prosecution could not have anticipated, in 1969, that in 1998 science would be able to test the DNA of the semen sample found at the crime scene. Dr. Blake testified that, in 1969, the only genetic marker testing available was ABO typing, which was far from definitive. During the 1970's, 1980's and 1990's, DNA analysis was being developed through work on two separate methodologies, PCR and

> RFLP (restriction fragment length polymorphism). However, as late as the early 1990's, scientists were still "quite a ways" from being able to individualize a sample using the PCR testing method. Although there was a "decent" chance of individualizing a sample using the RLFP method developed as early as the late 1980's, this method could not be used in this case because the age of the sample at the time RFLP testing came in to being. Dr. Blake testified it would have been an "irresponsible scientific exercise" to test the 20-year old semen sample using RLFP methodology. It was not until 1997 that PCR testing became sufficiently advanced to allow individualized results and, with PCR testing, the age and condition of the sample was not so much an issue.

(Respondent's Exhibit 10, at 7-8.)

The victim was murdered in December 1969. (RT 966-967.) While Petitioner was a suspect in her crime (RT 1178), there was no physical evidence and virtually no circumstantial evidence linking him to the murder. As Respondent submits, Commander Luttrell and other officers continued their crime-solving efforts in the years following the murder. Detectives unsuccessfully followed up every lead they received relating to the murder. (RT 1191-1193.) The crime remained unsolved until 1998, when Commander Luttrell learned of a new DNA testing procedure and sent the sample to a lab for testing. (RT 1193-1194.)

Prior to 1998, the testing procedures in place were inadequate to test the semen sample collected in this case. Specifically, in 1969, the ABO blood group system was the only serological test available in the forensic field. (RT 1543-1545.) The ABO system, however, was not as statistically dispositive as DNA testing. Although older DNA testing methods (RFLP) gained forensic acceptance in 1988, these procedures were limited because they could not test degraded samples, and there had to be a sufficient biological sample to test. (RT 1553, 1559.) Dr. Edward Blake, the forensic scientist who tested the sample in this case, opined testing a 20-year-old sample using the RFLP method "would be an irresponsible scientific exercise" due to degradation. (RT 1559-1563.) In 1997, the PCR STR method, the test used here, was forensically established. (RT 1568.) That same year the California Department of Justice ("DOJ") began using the PCR STR testing method. (RT 1638.) The DOJ tested samples in this case in November 1998. (RT 45, 51, 61-62, dated March 13, 2000.)

As explained above, the delay in this case was necessitated by the need of further investigation and no due process violation therefore occurred. The Court of Appeal reasonably

1  applied <u>Lovasco</u> and <u>Marion</u> because the prosecution could not have anticipated, in 1969, that in
2  1998, science would be able to test the DNA of the semen found at the crime scene.
3        In his traverse, Petitioner makes conclusory and speculative attempts to demonstrate that he
4  was actually prejudiced by the delay.  Petitioner fails to demonstrate or allege actual prejudice in
5  relation to the evidence in his case.  Petitioner presents nothing more than a mere possibility that
6  certain witnesses memories may have faded over time or that certain testimony was lost, which is
7  insufficient to demonstrate actual prejudice.  See <u>Prantil v. California</u>, 843 F.2d at 318; <u>United States</u>
8  <u>v. Ross</u>, 123 F.3d at 1186.  Accordingly, Petitioner's claim fails on the merits.
9  E.    <u>Admission of Propensity Evidence</u>
10        Petitioner contends that the introduction of his uncharged sexual assault offenses violated his
11  due process and equal protection rights.
12        In this case, the challenged propensity evidence related to two uncharged acts of sexual
13  assault against two different women.  (RT 1387-1414, 1490-1518.)  The evidence was ruled
14  admissible pursuant to California Evidence Code sections 352 and 1108 during a pretrial motion
15  because it was the prosecution's theory that Petitioner murdered the victim while engaged in a sexual
16  assault.  (RT of April 10, 2002 at 85-106, 1370-1371, 1448-1450.)  Thereafter, the trial court
17  instructed the jury with CALJIC No. 2.50.01 (RT 2138-2139), which properly directed the jurors
18  how to apply the evidence after determining whether the uncharged offenses were proven by a
19  preponderance of the evidence.
20        On direct review, the Court of Appeal held the admission of the prior uncharged sexual
21  assaults did not violate Petitioner's due process right under the United States Constitution.
22  Specifically, the Court of Appeal held:
23  > The testimony of P.L[.] and M.G. was highly probative.  Section 352 is designed for situations in which evidence of little evidentiary impact evokes an
24  > emotional bias. [Citation.] Each of the prior attacks occurred when [Petitioner] was denied sexual favors, each involved the use of angry force, and each involved choking
25  > the victim to attempt to gain compliance.  The two prior incidents were not isolated assaults upon third persons designed to show that [Petitioner] was in general a bad
26  > human being, but instead involved the same type of criminal act, executed in the same manner relatively close to the date of the murder, and thus highly probative.
27  > Although it was certainly prejudicial to [Petitioner], the prejudice to the defense was of the sort that naturally flows from relevant, highly probative incriminating evidence.
28  >     [Petitioner] contends the evidence was particularly prejudicial because of the

> passage of time. He claims he was "unable to mount any defense to the uncorroborated allegations." However, [Petitioner] has made no showing that he would have been able to mount a defense in the absence of the delay. [Citations Omitted.]
>
> The trial court carefully considered each of the prior offenses offered by the prosecution and excluded several under section 352 for various reasons. The court spent considerable time weighing the relevant factors before ruling that the assaults on P.L. and M.G. would be admitted. The court's comments are thoughtful and well reasoned. There was no abuse of discretion. [Citations Omitted.]

(Respondent's Exh. 10, at 21-22.)

California Evidence Code section 1108 provides in relevant part:

(a) In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.[11]

There is no United States Supreme Court authority finding that the use of propensity evidence violates due process. In fact, to date the United States Supreme Court has declined to rule on the constitutionality of the use of propensity evidence. See Estelle v. McGuire, 502 62, 75 n.5 (1991). In United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001), the Ninth Circuit held the admission of prior acts of child molestation admissible under Federal Rules of Evidence 414 (the federal equivalent of California Evidence Code section 1108), did not violate the defendant's right to due process because the balancing test in Rule 403 (the federal equivalent of California Evidence Code section 352) adequately protected his right. Id. at 1031.[12] Here, as the Court of Appeal stated, and this Court finds, the trial court carefully considered each of the prior offenses offered by the prosecution and exercised its discretion to admit and exclude certain evidence under section 352. (RT 85-106, 1308-1315, 1366-1372.) The court carefully examined and spent a significant amount of time in determining whether the assaults on P.L. and M.G. were admissible, properly finding they were. Given that the protections under section 352 were in place and adequately exercised, the state courts'

---

[11] California Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger on undue prejudice, of confusing the issues, or of misleading the jury."

[12] Federal Rules of Evidence 403 states: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

13

determination that the evidence was properly admitted is not contrary to or, an unreasonable application of, clearly established Supreme Court precedent.

F.    Admission of Autopsy Report

Petitioner contends that the state court violated his constitutional rights to due process and confrontation under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution when it allowed use of the coroner's report because it "was inadmissible under any exception to the hearsay rule."[13]

Petitioner's trial counsel sought to exclude introduction of the coroner's autopsy report on hearsay grounds. (RT of April 8, 2002 at 10-11; RT of April 12, 2002 at 193-197.) The prosecutor countered that she did not intend to introduce the 1969 report into evidence, instead she intended on having Drs. Welti and Slaughter render their expert opinions from the report. (RT 198-199.) Recognizing that under state law an expert may rely on hearsay to render an opinion, Petitioner's trial counsel then claimed the coroner's autopsy report was unreliable hearsay because of the coroner's 1989 felony drug conviction.[14] Thereafter, the trial court held an evidentiary hearing to determine whether the coroner's autopsy report bore sufficient indicia of reliability. (RT 228-248, 254-295.) After hearing the testimony of two witnesses, the trial court ruled the report bore sufficient indicia of reliability and, thus, could be used to form the basis of an expert opinion. (RT 297-305.) During trial, both doctors rendered their expert opinions using the coroner's autopsy report. (RT 731-735, 1046-1050.)

The Court of Appeal held that the expert testimony was proper under California Evidence Code section 801.[15] The appellate court noted, "so long as the threshold requirement of reliability is

---

[13] As Respondent submits, to the extent Petitioner contends that the coroner's report was admitted as evidence, this assertion is factually incorrect. The report itself was not admitted as evidence. (RT 199, 301.)

[14] Dr. Hayes, the coroner, had died prior to the trial. (RT 913.)

[15] California Evidence Code section 801 provides:
If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:
(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and
(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him or before the hearing, *whether or not admissible*, that is of

satisfied, even a matter that is ordinarily inadmissible may be a proper basis for an expert's opinion testimony. [Citations; original italic.]" (Respondent's Exh. 10, at 15.)

Initially, as Respondent argues, to the extent Petitioner challenges the admission of the evidence from the autopsy report under California law, it is not cognizable under section 2254. Habeas corpus relief is not available to correct alleged errors in the state court's application or interpretation of state law. Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480 (1991); Middleton v. Cupp, 768 F.2d 1083, 1084-85 (9th Cir.1985).

In any event, the Court of Appeal determined there was no error in allowing each expert to base their opinion on the coroner's report. A determination of state law by a state appellate court is binding in a federal habeas action, Hicks v. Feiock, 485 U.S. 624, 629 (1988), unless the interpretation is an "obvious subterfuge to evade consideration of a federal issue." Mullaney v. Wilbur, 421 U.S. 684, 691 n. 11 (1975); see also Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (federal habeas court must respect a state court's application of its own law and must not engage in *de novo* review). Federal habeas review is limited to a determination of whether the alleged error of state law "so infected the trial with unfairness as to deny due process of law". Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482 (1991). As there was no error in admitting evidence of the reliance on the coroner's report, it cannot be said that Petitioner's trial was so infected with unfairness as to deny him due process of law. The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. As such, Petitioner's claim fails.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The amended petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

These Findings and Recommendations are submitted to the assigned United States District

---

a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion. (Italics added.)

15

1  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the
2  Local Rules of Practice for the United States District Court, Eastern District of California.  Within
3  thirty (30) days after being served with a copy, any party may file written objections with the court
4  and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate
5  Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within
6  ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will
7  then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are
8  advised that failure to file objections within the specified time may waive the right to appeal the
9  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

        IT IS SO ORDERED.

        **Dated:   November 9, 2005**            **/s/ Dennis L. Beck**
        3b142a                                   UNITED STATES MAGISTRATE JUDGE